## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

EDWARD NEWMAN,

      *Plaintiff,*

                           CASE NO. 2:19-cv-11751

*v.*

                           DISTRICT JUDGE TERRENCE G. BERG

MICIHGAN DEPARTMENT
OF CORRECTIONS,
GREGG HISSONG,               MAGISTRATE JUDGE PATRICIA T.
                           MORRIS

      *Defendants.*

_____/

## REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 46)

### I.    RECOMMENDATION

For the following reasons, **I RECOMMEND** that the Court **GRANT** Defendants' motion for summary judgment (ECF No. 46).

### II.    REPORT

#### A.    Background

##### 1.    Newman's Medical Restrictions and Termination

Edward Newman is a prisoner in the custody of the Michigan Department of Corrections ("MDOC") at the Gus Harrison Correctional Facility ("ARF") in Adrian, Michigan. (ECF No. 1, PageID.1). After he was incarcerated, Newman

1

developed "permanent" blood clots in his right leg stemming from a past gunshot wound. (ECF No. 46-4, PageID.320–21). These blood clots inhibited Newman's ability to walk and stand. Indeed, Newman could only stand for "about an hour" before he would need to sit down from pain. (*Id.* at PageID.320). He also could not "jog" or "jump rope," and while he could ride an "exercise bike" for a short period of time, his "leg [would] let him know when it's had enough." (*Id.*) To accommodate Newman's underlying limitations, the MDOC excused him from "standing" during his work assignments. (ECF No. 46-2, PageID.295, 308).

On January 30, 2019, Newman secured a job as a "napkin roller" in the prison cafeteria. (ECF No. 46-2, PageID.309; ECF No. 46-4, PageID.321). In this role, Newman wrapped "spork[s]" in napkins before the cafeteria served meals. (*See* ECF No. 46-4, PageID.319, 321; ECF No. 47, PageID.348). Newman worked two shifts before his supervisor, Gregg Hissong, returned from a break. (ECF No. 46-4, PageID.321, 328). According to Newman, Hissong saw him sitting on "milk crates" and asked Newman whether he had "a detail to be able to sit down on [the] crates." (*Id.* at PageID.328). Newman responded by showing Hissong a document describing his accommodation, and Hissong then told Newman that he was "terminated," explaining that Newman "can't work in the kitchen with [his

2

accommodation]."  (*Id.* at PageID.321, 328). (*But see* ECF No. 47, PageID.348).[1]

Regardless, Newman continued to show up to work over the next several days but would be sent away every time he did so.  (ECF No. 46-4, PageID.321–22).

Newman eventually filed a grievance regarding his purported "termination," requesting that he be allowed to work.  (ECF No. 17-2, PageID.97).  In response to the grievance, Hissong explained that he sent Newman back to his unit because he could not accommodate Newman's restriction as "sitting on milk crates" presented a "safety" issue, and Newman could not "sit in the dining room with the general population."   (ECF No. 17-2, PageID.98).   The MDOC rejected Newman's grievance, and the both the Warden and the MDOC Office of Legal Affairs upheld the rejection on appeal, agreeing that Newman could not sit while rolling napkins. (ECF No. 17-2, PageID.94, 96, 98).

On the same day that the MDOC denied Newman's grievance, Hissong submitted a written recommendation on a "Form CSJ-363" that Newman be terminated from his napkin rolling job.[2]  (ECF No. 46-2, PageID.309).  On the form, Hissong wrote that he was "requesting termination due to offender having a no

---

[1] Hissong admits that the "silverware wrapping" position is intended to "accommodate prisoners with [standing] limitations."  (ECF No. 47, PageID.350).
[2] By recommending that Newman be terminated, Hissong apparently conceded that Newman had not yet been terminated, and that he had no authority to terminate Newman himself.  (ECF No.1, PageID.12).  Yet, the form states that Newman was terminated over a week before Hissong filled out the form.  (*Id.*)

standing detail." (*Id.*)  Hissong's recommendation was accepted, and Newman was terminated from his position.  (*See* ECF No. 17-2, PageID.96; ECF No. 46-2, PageID.295–96).

Hissong later signed a declaration in which he states that the explanation he provided on the CSJ-363 was "incorrect" and that the form "should have stated that Newman . . . failed to report to his work detail for over three days." (ECF No. 47, PageID.350).  He explains that "[u]pon signing the CSJ-363, [he] failed to notice that the statement regarding [Newman's] termination did not accurately reflect that he was terminated for failure to report to his job assignment." (*Id.*)  Hissong does not clarify whether Newman accrued these absences while he was prevented from working his shifts.  (*Id.*)

## 2.    MDOC Work Program Policies

MDOC internal policies provide a structured process for officials to follow before removing inmates from work assignments.  Under Policy Directive 05.01.100, program supervisors must conduct performance evaluations for prisoners "assigned to work . . . programs," after the inmate has worked in the program for "two months."   MDOC PD 05.01.100 ¶ HH, https://perma.cc/3UKJ-VNAZ.  Supervisors must conduct follow-up evaluations "every six months thereafter." *Id.*  The Policy Directive instructs supervisors to use a specific form, referred to as a "CSJ-363," to conduct these evaluations. *Id.*

The CSJ-363 consists of thirteen categories under which supervisors give inmates a score of "0," "2," or "3" corresponding to the number of instances in which a prisoner failed to meet MDOC expectations.   (ECF No. 1, PageID.12; ECF No. 46-2, PageID.309).   For example, the first category evaluates whether a prisoner "was on time" for his or her work assignment. (ECF No. 46-2, PageID.309).   An inmate who was tardy three or more times would receive a score of zero for that category, while an inmate who was never late for his or her work assignment would receive a score of three. (*Id.*)   Supervisors must find a total score and compare it to the ranges the CSJ-363 designates as "below average," (zero to twenty-seven) "average" (twenty-eight to thirty-four), and "above average" (thirty-five to thirty-nine). (*Id.*)

If a supervisor gives a prisoner a "below average score" on the CSJ-363, then the prisoner must "be closely monitored for the next [thirty] calendar days." MDOC PD 05.01.100 ¶ II. After thirty days, the supervisor must complete another CSJ-363, and if the prisoner's score does not fall within the "satisfactory/average range," then the prisoner must be terminated and "referred for reclassification." *See id.* at ¶¶ II–JJ. A work supervisor who recommends termination must do so using a CSJ-363 and submit his or her recommendation to the Classification Director, who must review the supervisor's recommendation. *Id.* at ¶ JJ.

The Policy Directive provides only one other procedure through which prison officials may remove inmates from work assignments. "With prior approval of the Warden or designee," officials may suspend a prisoner "charged with any misconduct." *Id.* at ¶ EE. The misconduct rules are governed by Policy Directive 03.03.105. "If the prisoner is found guilty at the initial misconduct hearing," then he or she must be terminated and "considered for reclassification." *Id.* at ¶ FF.

### 3.   Procedural History

Newman later filed a complaint against Hissong and the MDOC. Following a motion for summary judgment on the basis of exhaustion, the Court dismissed most of Newman's claims, but allowed his Eighth Amendment claim against the Hissong, as well as his ADA and RA claims against the MDOC, to go forward. (ECF Nos. 22, 41). A month later, the Undersigned stayed this action and referred the matter "to the Court's *pro bono* program" to obtain counsel for Newman. (ECF No. 42, PageID.245). After a ninety-day stay, the Court failed to find an attorney to represent Newman. (ECF No. 43).

Defendants then filed their second motion for summary judgment, this time addressing the merits of Newman's remaining claims. (ECF No. 46). However, Newman did not respond to Defendants' motion. He explained that he was blind and that he had lost access to a "legal writer" whom he had relied on throughout litigation to read and respond to Court filings. (ECF No. 51, PageID.370). So giving

Newman the benefit of the doubt, the Undersigned stayed proceedings for another sixty days to again try to secure counsel for Newman. (ECF No. 53, PageID.394). The Undersigned informed the parties, however, that "[i]f the Court [could not] obtain counsel for Newman within 60 days, then the stay [would] be lifted, the [C]ourt [would] not grant Newman additional time to respond to Defendants' motion, and Newman [would] proceed *pro se*. (*Id.*) On January 30, the Undersigned lifted the stay and noted that the Court had failed to secure counsel for Newman. (*Id.*)

### B.    Standards of Review

Although Defendants purport to move for summary judgment under Rule 56, they argue in the alternative that the Court should dismiss Newman's complaint for failure to state a plausible claim for relief pursuant to Rule 12(b)(6). (ECF No. 46, PageID.272–73, 288–90). Thus, while contained in a single document, Defendants present the Court with two distinct motions: one to dismiss Newman's complaint and one for summary judgment.

Federal Rule of Civil Procedure 12(d) does not prohibit the Court from ruling on both of Defendants' alternative motions. Rule 12(d) provides that when "matters outside the pleadings are presented to and not excluded by the Court" on a 12(b)(6) motion, the Court must treat the motion "as one for summary judgment." Fed. R. Civ. P. 12(d). Accordingly, the Sixth Circuit has explained that when a party supports

7

or opposes a Rule 12(b)(6) or Rule 12(c) motion with evidence outside the pleadings, district courts must either "expressly" exclude the evidence from consideration or treat the motion as one for summary judgment. *Max Arnold & Sons, LLC v. W.L. Hailey & Co., Inc.*, 452 F.3d 494; *see also Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483–85 (6th Cir. 2020). And some courts within this Circuit have extended those holdings to situations where exhibits are merely provided alongside a Rule 12 motion, in support of an alternative motion for summary judgment. *E.g.*, *Christensen v. United States*, No. 5:14-134-DCR, 2015 WL 19114337, at *2 (E.D. Ky. Apr. 27, 2015); *accord Brisbane v. Hogan*, No. JKB-17-1598, 2018 WL 1399813, at *2 (D. Md. Mar. 20, 2018).

That approach is mistaken. Rule 12(d) only applies where "matters outside the pleadings" are presented "*on*" a Rule 12 motion. Fed. R. Civ. P. 12(d) (emphasis added). And a motion is not synonymous with a filing. Indeed, a motion is merely "a formal request directed to a court," and a single filing can contain multiple "requests." Bryan A. Garner, The Redbook: A Manual on Legal Style § 24.1(a), at 489 (4th ed. 2018). Thus, a document can reference exhibits that are germane to only one of multiple motions contained in the same filing. If a party presents exhibits concerning matters outside of the pleadings, but only relies on those exhibits to support its Rule 56 motion, then Rule 12(d) is not implicated. *See, e.g.*, *Beshears v. Marion Cty.*, No. 5:19-cv-304, 2021 WL 5034967, at *1, *4 (M.D. Fla. Sept. 17,

8

2021); 2015 WL 5286574; *Stuart v. Lisiak*, No. 1:14cv-1401, 2015 WL 5286574, at *1 (M.D. Pa. Sept. 10, 2015).

That is precisely what Defendants do here. Although they present exhibits that contain matters outside of the pleadings, they only rely on these exhibits to advance their Rule 56 motion. When Defendants attack the sufficiency of Newman's pleadings, they do not rely on any exhibits. (*See* ECF No. 46, PageID.272–73, 288–90).

Accordingly, the Court should first consider the threshold issue of whether Newman states a plausible claim for relief as to his remaining claims, and if so, the Court should then consider whether Newman raises a genuine dispute of material fact under Rule 56.

### 1.    12(b)(6) Standard

A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Accordingly, a plaintiff's complaint shall be dismissed for failure to state a claim if it lacks sufficient "factual matter (taken as true) to" provide "plausible grounds to infer" that the elements of a claim for relief could be met. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *see* Fed. R. Civ. P. 12(b)(6). A complaint must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Mere labels, conclusory statements, or "formulaic recitations" of the elements of a cause of action

9

are not sufficient to meet this burden if they are unsupported by adequate factual allegations. *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). The requirement to provide a plausible claim does not require that a claim be "probable"; however, a claim must be more than merely "conceivable." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–80 (2009).

Because Newman filed his complaint *pro se*, his pleadings are liberally construed. *Spotts v. United States*, 429 F.3d 248, 250 (6th Cir. 2005) (citing *Haines v. Kerner*, 404 U.S. 519, 520 (1972)).

### 2.    Summary Judgment Standard

A court will grant a party's motion for summary judgment when the movant shows that "no genuine dispute as to any material fact" exists. Fed. R. Civ. P. 56(a). In reviewing the motion, the court must view all facts and inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party bears "the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)) (internal quotation marks omitted). In making its determination, a court may consider the plausibility of the movant's evidence. *Matsushita*, 475 U.S. at 587-88. Summary

judgment is also proper when the moving party shows that the non-moving party cannot meet its burden of proof. *Celotex*, 477 U.S. at 325.

The non-moving party cannot merely rest on the pleadings in response to a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). The non-movant cannot withhold evidence until trial or rely on speculative possibilities that material issues of fact will appear later. 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2739 (3d ed. 1998). "[T]o withstand a properly supported motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party." *Cosmas v. Am. Express Centurion Bank*, 757 F. Supp. 2d 489, 492 (D. N.J. 2010). In doing so, the non-moving party cannot simply assert that the other side's evidence lacks credibility. *Id.* at 493. And while a pro se party's arguments are entitled to liberal construction, "this liberal standard does not . . . 'relieve [the party] of his duty to meet the requirements necessary to defeat a motion for summary judgment.'" *Veloz v. New York*, 339 F. Supp. 2d 505, 513 (S.D.N.Y. 2004) (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)). "[A] pro se party's 'bald assertion,' completely unsupported by evidence, is not

sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

When the non-moving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479–80. The court will rely on the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404 (6th Cir. 1992). After examining the evidence designated by the parties, the court then determines "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251–52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

## C. Discussion

Only three of Newman's claims survived the Court's order on Defendants previous motion for summary judgment on the basis of exhaustion:[3] (1) an Eighth

---

[3] The Undersigned granted Defendants leave to file a second motion for summary judgment. (*See* ECF No. 45, PageID.253–54).

Amendment claim, under § 1983, against Hissong in his individual capacity, (2) a claim against the MDOC under Title II of the Americans with Disabilities Act ("ADA") against the MDOC, and (3) a claim against the MDOC under Section 504 of the Rehabilitation Act ("RA").  (*See* ECF Nos. 22, 41).  For the following reasons, I suggest that each remaining claim should be dismissed.[4]

### 1. Eighth Amendment

The Eighth Amendment prohibits "cruel and unusual punishment."  U.S. Const. amend. VIII.  This protection applies not only to the terms of a convicted defendants' sentence, but also to the "conditions under which" a prisoner "is confined."  *Helling v. McKinney*, 509 U.S. 25, 31 (1993).  To establish an Eighth Amendment violation, a prisoner must first show that he or she has been denied a "necessity of civilized human existence."  *Hadix v. Johnson*, 367 F.3d 513, 525 (6th Cir. 2004).  If the prisoner can make this threshold showing, he or she must then prove that the government knew of and disregarded that deprivation "by failing to take reasonable measures to" correct it.  *Farmer v. Brennan*, 511 U.S. 825, 829, 847 (1994); *see also Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004).

---

[4] Defendants argue that Newman cannot bring an employment discrimination claim under Title I of the ADA because he was not "employed" by the MDOC. (ECF No. 46, PageIOD.289–90).  They explain that prison "work assignments" are "conditions of confinement, not employment."  (*Id.* (citing *Starry v. Oshkosh Corr. Inst.*, 731 F. App'x 517, 519 (7th Cir. 2018)).  That is an accurate rendition of the law, but Newman does not allege that Defendants violated Title I.  (ECF No. 1, PageID.6, 8 (bringing discrimination claims exclusively under Title II of the ADA and Section 504 of the Rehabilitation Act)).

What constitutes a "necessity of civilized human existence" is determined by "contemporary standards of human decency" rather than a court's own "notions of enlightened policy." *Hadix*, 367 F.3d at 525 (internal quotation marks omitted) (quoting *Tillery v. Owens*, 907 F.2d 418, 426 (3d Cir. 1990)). By their nature, prisons are "[h]arsh and uncomfortable," so only "'extreme deprivations'" that deny inmates the "'the minimal civilized measure of life's necessities'" violate the Eighth Amendment. *Id.* (first quoting *Hudson v. McMillan*, 503 U.S. 1, 9 (1992); and then quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). These "minimal necessities" encompass basic human needs such as medical care, food, shelter, and safety from physical assault. *Farmer*, 511 U.S. at 832.

Equal access to a "napkin rolling" job is not of the same ilk as these basic necessities, and other courts have correctly held that prison officials do not violate the Eighth Amendment by terminating inmates from prison jobs. *E.g.*, *Johnson v. Pallito*, No. 2:12-CV-138, 2012 WL 6093804, at *10 (D. Vt. Nov. 26, 2012); *Fowler v. Howell*, No. 09-3172-CV-S-DGK-P, 2010 WL 11545254, at *3 (W.D. Mo. Aug. 23, 2010). While unpleasant, there is nothing "cruel" nor "unusual" about unjustified terminations from prison jobs. Accordingly, because Newman has not alleged that he was denied a necessity of civilized human existence, I suggest that he fails to even state a plausible claim for relief, and the Court should dismiss his Eighth Amendment claim.

## 2.  Discrimination Under Title II and the RA

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."   42 U.S.C. § 12132 (2018).   "[T]he phrase 'services, programs, or activities' encompasses virtually everything a public entity does."   *Tucker v. Tennessee*, 539 F.3d 526, 532 (6th Cir. 2008).   And corrections departments are "public entities" subject to the ADA.   *Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 210 (1998).   Like Title II, the RA prohibits public entities from discriminating against individuals "by reason" of their disability. 29 U.S.C. § 794(a) (2018).   And apart from a few additional requirements not at issue here, claims brought under Section 504 of the RA are analytically identical to claims brought under Title II.   *McBride v. Mich. Dep't of Corrections*, 294 F. Supp. 3d 695, 704 (E.D. Mich. 2018).

Because "neither the ADA nor the RA impose liability upon individuals," Newman may only bring his ADA and RA claims against the MDOC.   *Lee v. Michigan Parole Bd.*, 104 F. App'x 490, 493 (6th Cir. 2004).   However, the MDOC cannot be held vicariously liable under Title II or Section 504 for the actions of its employees under a *respondeat superior* theory.   *Jones v. City of Detroit*, 20 F.4th 1117, 1121, 1122–23 (6th Cir. 2021); *see also Thompson v. Tennessee Dep't of*

15

*Corrections*, No. 3:20-cv-0018, 2022 WL 1814141, at *2 (M.D. Tenn. June 2, 2022).

So to prevail on these claims, Newman must show that the MDOC violated his rights

under Title II and § 504 through its own "policy or custom." *Cf. Hafer v. Melo*, 502

U.S. 21, 25 (1991).

Often, a "policy" is a written rule which "establish[es] fixed plans of action to

be followed under similar circumstances consistently and over time." *Pembaur v.

City of Cincinnati*, 475 U.S. 469, 480–81 (1986) (plurality opinion).  But sometimes

a "policy" can be an *ad hoc* decision, "tailored to a particular situation and not

intended to control decisions in later situations." *Id.* at 481.  So long as that decision

can be attributed to the government entity itself, rather than a government employee,

the decision constitutes the "policy" of the government entity.  *Id.*

Here, there is no "formal" written policy or custom at issue, so to pursue his

ADA and RA claims against the MDOC, Newman must show that "an official vested

with final policymaking authority" removed him from his work assignment.  *Miller

v. Calhoun Cty.*, 408 F.3d 803, 813 (6th Cir. 2005) (citing *Pembaur*, 475 U.S. at

482–83).  Indeed, only actions made by officials with "final policymaking authority"

can be attributed to the government.  *Id.*; *see also Flagg v. City of Detroit*, 715 F.3d

165, 174–75 (6th Cir. 2013).  "Policy," the Supreme Court has explained, means

nothing more than "a specific decision . . . designed to carry out . . . a chosen course

of action."  *Pembaur*, 475 U.S. at 481 n.9 (internal quotation marks omitted)

(quoting Webster's Third New International Dictionary 1754 (1981)). And for a "decision" to be final, it cannot be subject to even the possibility of review by a superior officer. *See Miller*, 408 F.3d at 814 (analyzing whether an official's discretionary decisions were "subject to review," rather than whether they were actually reviewed in practice); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 130 (1988) (plurality opinion) ("Simply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy."). A final decision must also be discretionary—a decision that is routine or predetermined by a superior officer is not "final." *Pembaur*, 475 U.S. at 483 (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)). Although the Sixth Circuit has remarked that final decision-makers generally "formulate plans for the implementation of broad goals," the "hallmark of [government] liability is the *finality* of the decision being reviewed." *Miller*, 408 F.3d 814, 818; *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (emphasis in original).

State law determines whether an official has final decision-making authority. *Tlapanco v. Elges*, 969 F.3d 638, 658 (6th Cir. 2020). And Michigan law grants the Director of the MDOC with "full power and authority to supervise and control the affairs of the department." Mich. Comp. L. § 791.203.[5] Of course, the Director may

---

[5] The Director's otherwise "full power" is subject to the "orders" of the Michigan Corrections Commission, which has authority to "determine all matters relating to the

"delegate[]" her authority to her subordinates, *Pembaur*, 475 U.S. at 483, and Michigan law provides a mechanism for her to do so. Under Mich. Comp. L. § 791.206, the Director "may promulgate rules" related to the "control, management, and operation of the general affairs of the [D]epartment." Pursuant to that grant of authority, the Director promulgated Policy Directive 05.01.100 which governs prisoner work programs, and grants prison officials with limited discretion to terminate prisoners from work programs. MDOC PD 05.01.100, https://perma.cc/3UKJ-VNAZ.

Although officials may delegate final decision-making authority to their subordinates, "final action" does not always "equate with final policy making authority . . ." *Binelli v. Charter Tp. of Flint*, 488 F. App'x 95, 99 (6th Cir. 2012); *see also Miller*, 408 F.3d at 814 (quoting *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993)). Writing for a plurality of the Supreme Court, Justice O'Connor explained that "[w]hen an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality." *Praprotnik*, 485 U.S. at 127; *see also id.* at 935 n.7 (Brennan, J., concurring) (agreeing with the plurality's explanation that discretionary actions outside the scope of a subordinate's

---

unified development of the correctional facilities, correctional industries . . . ." *Id.* §§ 791.202(1), 791.203; *see also* Mich. Comp. L. § 791.211.

delegated authority generally do not bind the government, but reasoning that the "relevant inquiry" should be "whether the policy in question is actually . . . enforced").

At the very least, this means that government bodies cannot be held liable where officials make decisions outside the scope of their delegated authority. *See id.* But the Sixth Circuit has read this language broadly, explaining that an official with final decision-making authority cannot bind the government entity if that official's decision-making authority "over a particular subject matter" is in any way "constrained by a superior's policy decisions." *Johnson v. Hardin Cty.*, 908 F.2d 1280, 1286–87 (6th Cir. 1990); *see also Arendale*, 519 F.3d at 601 (quoting *Praprotnik*, 485 U.S. at 123). In other words, the official must have unfettered authority to make "all" decisions regarding a particular subject matter. *Id.* at 1287; *see also Sowders v. Daviess Cty. Det. Ctr.*, No. Civ.A. 404CVP101M, 2006 WL 709580, at *11 (W.D. Ky. Mar. 21, 2006).

Consider the Sixth Circuit's decision in *Binelli v. Charter Township of Flint*. 488 F. App'x 95. There, the ordinance enforcement officer for Flint Township brought a First Amendment political patronage retaliation claim against a newly elected township supervisor who terminated her shortly after taking office. *Id.* at 96. In addition to her claims against the township supervisor, the plaintiff attempted to hold the township liable on the theory that the supervisor was a "final

decisionmaker" as to her termination.  *Id.* at 100.  The Sixth Circuit rejected that theory for two reasons.  *Id.*  First, it noted that the Township's "Board"—not its supervisor—was "'vested with the sole discretion to hire and fire employees.'"  *Id.*  Thus, the supervisor had no discretion to fire the plaintiff to begin with.  *Id.*  But even if she did have final decision-making authority to terminate the plaintiff, the Sixth Circuit noted that "most employment policy in the Township [was] set by the Board."  *Id.*  Because the supervisor's "authority" to make final decisions on "employment matters," generally, was "thoroughly constrained," her action could not be imputed to the Township.  *Id.*

Newman's claims against the MDOC fail for the same two reasons.  First, the authority of prison staff to remove inmates from works assignments is "thoroughly constrained."  As explained above, PD 05.01.100 requires program supervisors are to conduct performance evaluations for prisoners "assigned to work . . . programs," "two months" after the prisoner begins the program "and every six months thereafter."  MDOC PD 05.01.100 ¶ HH.  The Policy Directive instructs supervisors to use a specific form, referred to as a "CSJ-363," to conduct these evaluations.  *Id.*

The form consists of thirteen categories under which supervisors give inmates a score of "0," "2," or "3" corresponding to the number of instances in which a prisoner failed to meet MDOC expectations.  (ECF No. 1, PageID.12; ECF No. 46-2, PageID.309).  For example, the first category evaluates whether a prisoner "was

on time" for his or her work assignment.  (ECF No. 46-2, PageID.309).  An inmate who was tardy three or more times would receive a score of zero for that category, while an inmate who was never late for his or her work assignment would receive a score of three.  (*Id.*)  The form designates scores as "below average," (zero to twenty-seven) "average" (twenty-eight to thirty-four), or "above average" (thirty-five to thirty-nine).  (*Id.*)

If a supervisor gives a prisoner a "below average score" on the CSJ-363, then the prisoner must "be closely monitored for the next [thirty] calendar days."  MDOC PD 05.01.100 ¶ II.  After thirty days, the supervisor must complete another CSJ-363, and if the prisoner's score does not fall within the "satisfactory/average range," then the prisoner must be terminated and "referred for reclassification."  *See id.* at ¶¶ II–JJ.  A work supervisor who recommends termination must do so using a CSJ-363 and submit his or her recommendation to the Classification Director, who must review the supervisor's recommendation.  *Id.* at ¶ JJ.

The Policy Directive provides only one other procedure through which prison officials may remove inmates from work assignments.  "With prior approval of the Warden or designee," officials may suspend a prisoner "charged with any misconduct."  *Id.* at ¶ EE.  The misconduct rules are governed by Policy Directive 03.03.105.  "If the prisoner is found guilty at the initial misconduct hearing," then he or she must be terminated and "considered for reclassification."  *Id.* at ¶ FF.

21

Although these policies afford prison officials some latitude in deciding whether to remove inmates from prison jobs, they impose numerous substantive and procedural constraints on their decisions.  Through the policy directive and the CSJ-363, the Director decides the specific factors for officials to consider, the relative weight officials should afford to these factors, and the degree of compliance that is considered satisfactory.  (*See* ECF No. 1, PageID.12).  Moreover, the Policy Directive compels officials to follow an elaborate, structured process before removing an inmate from a work assignment.  MDOC PD 05.01.100 ¶¶ EE–JJ.  Because officials do not have unconstrained authority to remove inmates from work assignments, those decisions cannot be attributed to the MDOC itself.  *See Feliciano*, 988 F.2d at 655; *Johnson*, 908 F.2d at 1286–87.

But even if the officers' decisions to remove inmates from prison jobs could be attributed to the MDOC despite the significant constraints imposed by the policy directive, the officials here acted outside the Director's delegation of authority in PD 05.01.100 when they terminated Newman.  Indeed, Hissong recommended that Newman be terminated without scoring Newman's CSJ-363, without waiting for the initial two month period to elapse, and without following the procedural requirements of PD 05.01.100 ¶ II.  (*See* ECF No. 1, PageID.12; ECF No. 46-2, PageID.295; ECF No. 47, PageID.350).  Nor did Hissong, who apparently viewed Newman's no-standing restriction as a safety-hazard after witnessing Newman sit

on "milk crates," charge Newman with misconduct and follow the procedures outlined in Policy Directive 03.03.105.  (ECF No. 17-2, PageID.98).  Indeed, it appears that Hissong simply recommended that Newman be terminated, and that the classification director adopted Hissong's recommendation.  (*See id.*; ECF No. 46-2, PageID.295, 309).   So because Hissong and the director acted outside the "constrain[ts]" imposed by the Director in PD 05.01.100, it is the policy directive, not the officials' "departure from" the directive, that constitutes MDOC policy. *Praprotnik*, 485 U.S. at 127.  The discretion to remove Newman in this manner was never delegated to prison staff to begin with.[6]  *Cf. Binelli*, 488 F. App'x at 96.

Moreover, even if the classification director acted within the bounds of his discretion and was not "constrained" by the policy directive, Newman fails to allege (and the record does not establish) that a final decision-maker approved his termination.  Indeed, the policy directive authorizes four entities to review "work assignment decisions" made by the classification director: (1) the warden, (2) the CFA deputy director, (3) the "reentry program development unit," and (4) the parole board.  MDOC PD 05.01.100 ¶ D.  Newman does not allege that any of these

---

[6] In Newman's complaint, he alleges that the MDOC "failed to take corrective remedial measures" after he had been terminated. (ECF No. 1, PageID.7).  However, Newman does not allege any facts that would support an "inaction" theory.  *See generally Miller*, 408 F.3d at 815.

individuals were involved in his termination, and the record only establishes that ARF's warden approved his termination. (*See* ECF No. 17-2, PageID.96).

Accordingly, I suggest that Newman's removal from his job cannot be attributed to the MDOC. Newman fails to allege that Hissong (or any other official involved in his termination) was a final decision-maker, and on the record before the Court, he cannot raise a genuine dispute of material fact as to whether his termination is attributable to the MDOC. The Court, therefore, should dismiss Newman's ADA and RA claims against the MDOC.

### D. Conclusion

For these reasons, **I RECOMMEND** that this Court **GRANT** defendants' motion for summary judgement (ECF No. 46).

## III. <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir.

1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this R&R.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this R&R to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  February 17, 2023             s/ PATRICIA T. MORRIS
                                     Patricia T. Morris
                                     United States Magistrate Judge